**UNITED STATES of America**

v.

**Jeffrey SANTIAGO, Defendant.**

**No. 96 Cr. 698.**

United States District Court,
S.D. New York.

Dec. 31, 1996.

Mark A. Godsey, Assistant United States Attorney, Southern District of New York, New York City, for U.S.

James Roth, Hurwitz Stampur & Roth, New York City, for Defendant.

1. The transcript of the November 22 suppression

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

Defendant Jeffrey Santiago ("Santiago" or "defendant") is charged with possession of a firearm and ammunition by a convicted felon and possession of a firearm with an adulterated serial number, in violation of Title 18 U.S.C. §§ 922(g) and 922(k). Defendant now moves to suppress the firearm and ammunition seized at the time of his arrest. A hearing was held on November 22, 1996. Post-hearing letter briefs were received on December 9, 1996.

## I. FACTUAL BACKGROUND

### A. *Testimony at the Suppression Hearing*

Defendant was a passenger in the rear passenger-side seat of a livery cab. At approximately 10:40 p.m. on the evening of July 2, 1996, three officers of the New York City Police Department ("NYPD") stopped the livery cab in the vicinity of 159 Soundview Avenue in the Bronx in furtherance of a program known as the Mobile Taxi/Livery Robbery Task Force for the purpose of conducting a routine safety check. Two of the officers testified at the suppression hearing. The officers described both the safety program generally and the stop resulting in defendant's arrest. The defense did not offer any testimony.

Officer James O'Connor testified that he is currently assigned to the street crime unit. He then described the taxi livery task force which was created in 1993. R–12.[1] The task force was created to "educate taxicab drivers on safety and decrease the robberies and homicides against taxicabs." *Id.* In order to achieve this goal the police perform "safety vehicle stops." R–13. Officer O'Connor then described a safety vehicle stop.

We usually pull our unmarked police car behind the taxicab, turn on the flashing turret light which is the red light in place on the dashboard and we have flashing headlights. Pull behind the taxicab, flash the headlights, the car usually pulls over to the right, you pull over behind the car, me and my partner exit the car, the driver

hearing will be referred to as "R– ".

walks up to the driver and passenger walked up to the passenger side, have a brief discussion with the driver, give him a safety pamphlet and tell him of some taxi—some safety tips.

R–13–14. Later in the hearing, the same witness again described what usually occurs during the stop.

My partner or whoever is driving will approach the driver and the passenger approaches the passenger. The driver usually has a conversation with the cab driver, how are you doing, sir, everything okay, tonight, we are doing a safety check for your safety, issue a pamphlet and *usually the [officer who is the] passenger will inspect the back seat of the cab, make sure everything is okay in the back, the passenger is okay.*

R–31 (emphasis added). Officer O'Connor testified that generally he pulled over "every occupied cab we can pull over." R–16. If more than one occupied cab drove by at once, he pulled over the nearest cab. R–17; R–43.[2] He also testified that earlier in the life of the program the street crime unit pulled over one in five cabs. *Id.* Officer O'Connor stated that the program was governed by unwritten rules. "It has been passed on. It is an unwritten rule of thumb more or less." R–18. *See also* R–48. He never received any written manuals or special training in taxi stops. R–45. There were no regulations governing the police in performing the stops. R–48.

On the night of July 2, 1996, Officer O'Connor was riding in an unmarked vehicle, in plainclothes, together with Officers Miller and Morley. He was in the front passenger seat. R–28. He was unsure whether they had agreed to stop every occupied cab or one in five. *See, e.g.,* R–28; R–43; R–51–53; R–83. The livery car in which Santiago was riding was stopped solely because it was an occupied livery cab. R–36. The officers used their turret light and rotating head-

lights to pull over the car. R–32. When the cab pulled over, Officer O'Connor observed "the occupant in the back seat of the car looking over his left shoulder like this several times." R–37. The officer then left his vehicle. "As I was approaching the taxicab on the passenger side, I observed the occupant reach down with his right shoulder dipping. We call it a dip. He appeared to be placing something on the floor." *Id.* After seeing the passenger "dip", the officer turned on his flashlight to see inside the cab. The officer was not entirely sure when he began using his flashlight. On direct examination, he testified that he used the flashlight when he was at the rear passenger window just behind the passenger. R–38. He later testified that he used the flashlight as he approached the cab, shining the light first through the rear window and then through the right rear window. R–68; R–74. In any event, he testified that he believed that the rear passenger window was down. R–41; R–73. As he looked in the cab, he "observed what appeared to be the handle of a weapon underneath between his legs, it was taken out (sic) from the seat." R–38.[3] He later explained that the handle was visible underneath the front passenger seat. R–77. At that point the officer asked the passenger to leave the cab. R–39. The other officer then came around from the driver's side and retrieved a gun from the floor. Defendant denied ownership of the gun and was placed under arrest. *Id.*

Officer Jeff Miller also testified at the hearing. Like Officer O'Connor, Officer Miller has been a police officer five years and is currently assigned to the street crime unit. R–85. He too described a typical taxi stop safety check. "We stop the cab using the red flashing light on the dashboard or alternating headlights. We go over to the cab, we speak to the cab driver. We speak to the passenger. . . . we tell them why the cab was stopped, you know." R–86. Officer Miller

---

**2.** A number of taxi drivers participated in this program by displaying a consent decal on the window of the cab. This decal indicated that the taxicab or taxicab driver consented to be stopped. It is uncontested that there was no consent decal present on this taxicab. R–58–59.

**3.** On cross examination, Officer O'Connor testified as follows: "Initially I saw his hands and then I shined my flashlight to the area where I saw him do the dip which was the floor and underneath the seat, sticking out from underneath the seat from the floor of the cab, I saw the handle of a gun. R–77.

testified that he stopped every occupied cab. If several go by at once, he stops the first one. R–88. Officer Miller testified that he was not given any specific guidelines to follow in terms of how many cars to stop or the pattern to use on a given night. R–99.

On July 2, 1996, Officer Miller was originally assigned to Brooklyn. His assignment was switched to the 43rd Precinct, located in the Bronx, "because there was a taxi robbery pattern in the Soundview/Castle Hill sections of the Bronx." R–89. Officer Miller worked that night with Officers O'Connor and Morley and believed that they were stopping every occupied cab. R–90. At approximately 10:40 p.m. in a desolate area, Miller testified that he observed an occupied cab. R–91. He pulled the cab over using the rotating red light on the dashboard and the alternating head lamps. R–92. As he pulled his car over, he noticed "the passenger in the back spinning around looking, kind of nervous at me." R–93. He was able to see into the cab because his "high beams were shining into the back of the car." R–107. He then left his car, walked toward the livery cab, shining his light through the back window. It was then that he saw the passenger dip down. *Id.* He then walked to the driver's side door in the rear and looked in the car using his flashlight. R–94. He saw the handle of a gun at the back of the front seat on the passenger side of the vehicle. *Id.* He was not sure if he looked through an open window or if he opened the door in order to look inside. R–95; R–101; R–103. At that point he drew his weapon for his own protection. *Id.* His partner then removed the passenger and he retrieved the gun. R–95–96.

The government introduced an English and Spanish version of "Safety Tips for the Tax Driver" the safety manual that is given to drivers. Exhs. 1A and 1B. It also introduced a police document, prepared on September 25, 1996, which is an unofficial statistical compilation of crimes against taxi drivers. Exh. 2. The chart shows that during the period 1993 through September, 1996, robberies have decreased from 3,675 (in 1993) to 1,089 (1996) and homicides have decreased from 45 to 13. Finally, the defense offered two photographs of the livery car in which the defendant was riding showing that the windows were heavily tinted. Exhs. A and B.

### B. *Findings of Fact*

Based on this record, I find that the police officers had no probable cause or reasonable suspicion to stop the taxicab. Rather, the stop was made pursuant to their understanding of the taxi safety patrol program. The testimony is contradictory as to the standard used for stopping taxicabs on the evening of July 2, 1996. However, there is no doubt that only occupied cabs were stopped. There is also no doubt that not all occupied taxicabs were stopped, as both officers testified that they were not able to stop all such cabs. Indeed, they both testified that they were only able to stop in the range of twenty to thirty taxicabs per night. R–29, 87. I accept their testimony that they stopped the nearest occupied taxicab in the area in which they were patrolling. I further accept their testimony that after stopping the cab they noticed defendant bend down as if placing something on the floor. Finally, I believe that when they looked into the back seat of the taxicab, they saw the handle of a weapon sticking out from beneath the front passenger seat. Officer O'Connor's testimony was unclear as to whether the rear passenger-side window was down. Officer Miller's testimony was unclear as to whether the rear driver's side window was down or whether he opened the door. I find that Officer Miller opened the rear driver-side door. I do not believe that the rear passenger-side window was down.

## II. DISCUSSION

### A. *Does Defendant Have a Cognizable Fourth Amendment Claim?*

■ The Government concedes that the defendant has standing to challenge the initial stop of the taxicab.

The case law is clear that while a non-owner passenger of an automobile has standing to challenge the initial stop of the automobile in which he is riding, a non-owner passenger does *not* have standing to challenge a subsequent search of the interior portions of that automobile.

Memorandum of Law in Opposition to Motion to Suppress ("Gov't Mem.") at 14.[4] The Government's concession is confusing in failing to acknowledge the necessary relationship between the stop of the taxicab (the seizure) and the ultimate search, which resulted from that stop. The first step in the analysis must be the propriety of the stop itself. If the stop is unconstitutional, the resulting search and seizure is tainted as fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). If the stop was proper, the Government questions whether defendant has a Fourth Amendment right to challenge the seizure of the gun from the interior of the taxicab. In order to decide this question it is necessary to determine whether defendant has an expectation of privacy in the rear passenger area of the taxicab.

### A. *The Stop of the Taxicab*

■ The Government concedes that a stop of a taxicab is a "seizure" within the meaning of the Fourth Amendment. *See* Gov't Mem. at 13. *See also United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678–79, 83 L.Ed.2d 604 (1985) (stopping car and detaining its occupants constitutes seizure under the Fourth Amendment). The Government further concedes that this stop was not based on probable cause or reasonable suspicion based on specific articulable facts.[5] Rather, the Government claims that this "suspicionless" stop is permissible under the authority of *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) and *Michigan v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (discussed below). Gov't Mem. at 7. Specifically, the Government conflates the standards set forth in checkpoint or roadblock cases with the language contained in roving patrol cases. The Government argues that if the stops are made pursuant to a neutral objective standard that does not permit the officer to exercise discretion to discriminate *and* the Government's interest in the program and its effectiveness outweigh the intrusion on an individual's Fourth Amendment rights, then the stop passes constitutional muster.[6] *See generally* Gov't Mem. at 7.

No appellate federal court has ever upheld a program of roving suspicionless automobile stops. Indeed, such stops were struck down in *Delaware v. Prouse,* (invalidating roving patrol for registration and license checks), and in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (invalidating roving-patrol stops by

4. In acknowledging defendant's right to object to the initial stop of the taxicab, the Government concedes that the stop interfered with the defendant's movement in the same manner as a street stop of a pedestrian interferes with his or her movements.

5. Because the police admittedly lacked the probable cause or reasonable suspicion necessary to stop the cab in the first instance, the gun would not be admissible under the automobile exception to the warrant requirement. The police may only conduct a warrantless search of an automobile if they have probable cause to believe that the automobile contains contraband. *See California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.), *cert. denied,* 510 U.S. 971, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993). Here, the Government acknowledges that at the time of the stop there was no probable cause to believe the occupants of the cab were engaged in criminal activity or were about to do so, or that the cab contained contraband.

6. The Government cites two recent New York trial court cases upholding the taxi safety patrol program. *See People v. Carty,* 164 Misc.2d 275, 624 N.Y.S.2d 771 (Sup.Ct. Queens Co.1995); *People v. Gomez,* 165 Misc.2d 197, 628 N.Y.S.2d 927 (Sup.Ct. Queens Co.1995). The *Gomez* court relied solely on the holding of the *Carty* case. In *Carty,* the court misconstrued the leading federal cases, particularly *Delaware v. Prouse* and *United States v. Brignoni–Ponce. supra.* The judge in *Carty* believed that these cases permitted roving stops of automobiles absent probable cause or reasonable suspicion. The holdings of those cases are exactly the opposite. The *Carty* court continued its analysis and found that the taxicab stops were analogous to the *roadblock* stops previously approved in *People v. John BB,* 56 N.Y.2d 482, 453 N.Y.S.2d 158, 438 N.E.2d 864, *cert. denied,* 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982). The court concluded that the taxi stops were permissible as "administrative" stops and that such stops were "reasonable" under the circumstances. While the court approved of the stop on this basis, the court went on to find that there was reasonable suspicion to search the cab because one passenger had jumped from the cab and fled and the other opened the door as if to flee. Suffice it to say that I believe that the reasoning of these cases is erroneous and should not be followed.

Border Patrol agents on roadways on less than reasonable suspicion). Suspicionless fixed checkpoint stops, however, have been upheld. *See Michigan v. Sitz, supra; United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Maxwell v. City of New York*, 102 F.3d 664 (2d Cir.1996) (upholding checkpoint that stopped all motorists seeking to enter particular neighborhood). The Supreme Court has explained its rationale for the distinction between roving patrol stops and checkpoint stops.

> [The] objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop.

*United States v. Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083. In *Delaware v. Prouse*, the Court compared a roadway random automobile stop to the impermissible stop by the Border Patrol. Both were distinguished from permissible roadblock stops.

> Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community.

*Id.* at 657, 99 S.Ct. at 1398. It seems likely that being pulled over by a police officer while driving around the City at night is as inconvenient and potentially frightening to a taxi driver as it would be to an ordinary driver.

The Government nonetheless argues that *Delaware v. Prouse* supports its position that the taxicab safety stops are permissible.

The argument is based on the concluding paragraph of the majority opinion in which the Court made the following statement:

> This holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.

*Id.* at 663, 99 S.Ct. at 1401 (footnote omitted). The Government also relies on *Michigan v. Sitz, supra*. While the Court in that case did balance the interests of the state in preventing drunk driving, the effectiveness of the challenged program in addressing that concern, and the severity of the intrusion upon individual liberty, the Court did so in the context of checkpoint or roadblock stops. The Court quoted the following language from an earlier decision.

> [T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

*United States v. Ortiz*, 422 U.S. 891, 894–95, 95 S.Ct. 2585, 2587–88, 45 L.Ed.2d 623 (1975). Directly following this quotation, the *Michigan v. Sitz* Court went on to state: "[H]ere, checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle." 496 U.S. at 453, 110 S.Ct. at 2487.

The Government contends that the NYPD's taxi safety program meets the test set forth in *Delaware v. Prouse*, in that the police officers do not exercise discretion. Rather, because the unwritten rule of the program is to stop every occupied taxicab, or one in five occupied taxicabs, this eliminates

the exercise of discretion and insures that the stops will be made in a neutral manner.

The Government is plainly wrong. The NYPD program does not apply neutral criteria. First, and most important, there are no written rules governing the manner in which the stops are to be made. According to the testimony, the individual police officers (or precinct commanders) decide where and when to conduct their stops. Second, there is no reporting with respect to these stops and no oversight as to whether they are truly being conducted in a neutral manner. R–48–49. Third, many of the criteria used by the NYPD for stopping cabs are not neutral. To begin with, stops are only of *occupied* cabs. If the goal of the program were really to hand out safety pamphlets to drivers, stops of unoccupied cabs, or of all taxicabs, would be just as effective as stops of occupied cabs. Indeed, such pamphlets could be distributed at taxi inspection stations, at the Taxi and Limousine Commission and with all registered medallion holders and livery services. The testimony also reveals that high crime areas are targeted. Thus, the NYPD decides where to conduct these roving patrols. Finally, while the patrols are conducted at different times, it appears they are most often conducted at night or in the early morning hours. Taken together, this program permits the exercise of a great deal of discretion by police officers and a possibility of an abuse of that discretion.[7]

Indeed, the decision to stop only occupied cabs results in an end run around the Fourth Amendment requirement that a stop, which by definition is a seizure, be based on probable cause or at least on reasonable suspicion. *See United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) ("Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."); *United States v. Scopo*, 19 F.3d 777, 781 (2nd Cir.1994) (traffic stop must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts that suggest unlawful conduct). It appears that the purpose of these stops is not only to hand out safety literature but to prevent the possibility of a crime. The only rational reason for the NYPD to distinguish between occupied and unoccupied taxicabs is to size up the passenger. The Fourth Amendment does not permit such governmental conduct absent at least reasonable suspicion. While a police officer may intervene to stop a crime in progress, or to prevent a crime that he reasonably suspects is likely to occur, he may not intervene based solely on a generalized suspicion of anticipated criminal conduct.[8]

In short, because the defendant was a passenger in a taxicab, who was in the midst of travelling from one point to another, he is

---

7. Because the stop in question fails the first prong of the test enunciated in *Michigan v. Sitz, supra,* namely neutral criteria for making a stop, there is no need to reach the second prong, namely the balancing of individual rights against the effectiveness of the program. Nonetheless, I note that the proof is slim as to the effectiveness of this program. While robberies and homicides have declined since the program went into effect, it is not clear whether that drop is due to this program and whether there is a less intrusive way to achieve the same result. It is noteworthy that during the same time period, criminal activity has dropped markedly throughout New York City. *See Murder Rate Drops Again; City Officials Expect to See Fewer than 1,000 Slayings,* Newsday, December 21, 1996, at A17. Murders in the five boroughs through December 15, 1996 totaled 937, the lowest rate since 1968. *Id.* Felonies generally have decreased 15.8 percent in 1996, and 46.9 percent since 1993. *Id.* Citywide, through December 15, the decrease in crime is impressive: reported burglaries, 18.5

percent; auto thefts, 17.4 percent; assaults, 14.5 percent; grand larcenies, 10.6 percent; rape, 4.3 percent. *Id.* Shootings also have fallen by 21.5 percent. *Id.* In addition, as noted above, educating the taxi drivers as to safety precautions can be achieved in a number of other ways, such as stopping unoccupied taxicabs or all taxicabs.

8. If the NYPD continues to believe that taxi stops are an important feature of the safety program then there may be ways to ensure that the program is administered in a truly neutral manner. First, the promulgation of written rules would be wise. Second, the stops could be done at certain checkpoints or roadblocks at which *all* taxicabs would be stopped. *See Maxwell v. City of New York, supra.* Finally, even in the absence of a checkpoint or roadblock, a roving patrol might be acceptable if the criteria called for stopping *all* taxicabs. However, given the testimony in this case it might not be feasible for a roving patrol to stop all taxicabs.

entitled to be free from unwarranted intrusion by the police. The Fourth Amendment guarantees such protection. I cannot explain the constitutional ground for my decision more eloquently than the Supreme Court did in *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.... When such a stop (random stop for identification) is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits. *See Delaware v. Prouse*, 440 U.S. at 661 [99 S.Ct. at 1400].

While I am bound to defer to the important constitutional principles that govern the outcome of this case, I am not unaware of the equally important goal that the NYPD taxi safety program is attempting to address. Like any resident of this City, I am aware of the high crime rate in certain sections of the City and the danger to which taxi drivers are routinely exposed. The goal of interdicting such crimes is critical to maintaining the quality of life in this City. Nonetheless, on balance, the constitutional protections afforded to all cannot be bent in order to address a particularly unfortunate problem.

### B. The Search of the Vehicle and the Seizure of the Weapon

#### 1. Fourth Amendment Interest

The Government, of course, argues that the stop of this taxi was constitutionally sound. It then argues that defendant has no legitimate expectation of privacy in the rear seat of the taxicab that would permit him to challenge the search and seizure of the weapon. I address this issue because courts may differ with respect to the propriety of the stop and because the parties have both addressed this issue.

In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Court held that the relevant inquiry is "properly placed within the purview of substantive Fourth Amendment law [rather] than within that of

standing." *Id.* at 140, 99 S.Ct. at 428. The threshold question is whether the defendant has a cognizable Fourth Amendment claim. In order to answer that question, the court must determine whether an accused "had any legitimate expectation of privacy in the areas of the car which were searched." *Id.* at 149, 99 S.Ct. at 433. The defendant bears the burden of proving that he has a legitimate expectation of privacy in the area that was searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

In order to make this determination a court must engage in a fact-specific expectation of privacy analysis.

> In general, a defendant may establish that he had a right protected by the Fourth Amendment by showing (a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy.

*United States v. Perea*, 986 F.2d 633 (2d Cir.1993) (citing *California v. Greenwood*, 486 U.S. 35, 39 (1988)); *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967). The first prong of this test is the objective prong, which requires the court to determine whether society accept defendant's expectation of privacy as reasonable. A person does not need to be the owner of property in order to assert a privacy interest, he need only be able to exclude others from dealing with the property. Typically, a passenger in an automobile does not have a right to expect privacy as he has no right to exclude others from the car. *See e.g.*, *Rakas v. Illinois*, 439 U.S. at 148–49, 99 S.Ct. at 432–33; *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir.1988), *cert. denied*, 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989); *United States v. Smith*, 621 F.2d 483, 487 (2d Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *United States v. Ruggiero*, 824 F.Supp. 379 (S.D.N.Y.1993), *aff'd sub nom. United States v. Aulicino*, 44 F.3d 1102 (2d Cir.1995).

However, a passenger in a taxicab may exclude others from the cab, as he has hired the cab for his exclusive use for the duration of his trip. In effect, the passenger area belongs to the passenger who pays for it during the course of the trip. The passenger determines the destination of the taxicab. *See United States v. Harris,* 1989 WL 252648 (D.D.C. Oct. 12, 1989); *Chapa v. State,* 729 S.W.2d 723 (Tex.Cr.App.1987); *People v. Millan,* 69 N.Y.2d 514, 516 N.Y.S.2d 168, 508 N.E.2d 903 (1987); *Bates v. State,* 64 Md. App. 279, 494 A.2d 976 (1985); *People v. Castro,* 125 Misc.2d 15, 479 N.Y.S.2d 414 (Sup.Ct.1984). *Cf. Perea,* 986 F.2d 633 (taxicab passenger has no standing to contest a search of the trunk of a taxicab since he does not have exclusive possession of the trunk). For these reasons, defendant's expectation of privacy is objectively reasonable and one that society has accepted. Defendant easily meets the second prong of the test. His subjective expectation of privacy was manifested by entering the cab, closing the door and directing the driver to a particular destination. Finally, the area that was searched was the interior of the rear seat of the taxicab. The search occurred as a result of shining a flashlight through the rear passenger window and through the rear driver's door opened by the police. There is no question that the rear seat of the taxicab belongs exclusively to the passenger for the duration of the ride for which he hired the cab. Thus, defendant has established a Fourth Amendment interest in the search and seizure at issue in this stop.[9]

## III. CONCLUSION

For the reasons discussed above, the stop of the taxicab was unlawful and the evidence seized as a result of that stop must be sup-

---

**9.** While the defendant has established a Fourth Amendment right to challenge the search of the taxicab and the seizure of the weapon, the "plain view" doctrine would permit the search of the taxicab which resulted in the seizure of the gun. *See United States v. Scopo,* 19 F.3d 777, 782 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994) (police may seize evidence in plain view if initial intrusion permissible, discovery was inadvertent and nature of evidence immediately apparent); *United States v.*

pressed. A conference is scheduled for January 6, 1997 at 10:00 a.m.

SO ORDERED:

*Medina,* 944 F.2d 60, 69 (2d Cir.1991), *cert. denied,* 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). If the stop of the vehicle was proper, the evidence would not be suppressed. *Cf. Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990) ("essential predicate" to plain view exception to the warrant requirement is that police did not violate Fourth Amendment in arriving at place from which evidence is viewed).