■ In the Matter of MUHAMMAD F., a Person Alleged to be a Juvenile Delinquent, Appellant. [683 NYS2d 477] —Order of disposition, Family Court, New York County (Leah Marks, J.), entered on or about September 20, 1996, which adjudicated appellant a juvenile delinquent and placed him with the Division for Youth for a period of 18 months upon a fact-finding determination that appellant committed acts which, if committed by an adult, would constitute the crimes of criminal possession of a controlled substance in the third degree, criminal possession of a controlled substance in the fourth degree, and criminally using drug paraphernalia in the second degree, reversed, on the law, without costs, and the petition dismissed.

At the suppression hearing, Officer Miller, assigned to the Street Crime Unit, testified that he was participating in an organized program to conduct safety checks of taxi cabs, including both medallion taxis as well as livery and "gypsy" cabs. He stated that the safety check involved asking "the passengers to step out briefly while we look through under [*sic*] the seats or in between the slots where the back seat meets the backrest." He testified that while officers assigned to the program were not acting pursuant to any written instructions, departmental procedures required that the stops "be done in [*sic*] a set basis and not just arbitrarily".

Working the 6:00 P.M. to 2:00 A.M. shift, Officer Miller and his partner, Officer Morley, were driving an unmarked car and dressed in civilian attire. Officer Miller stated that they "were out there looking for street crimes and also taxi robberies" and that he had decided to stop "one in three occupied cabs". At about 11:00 P.M., they pulled over a non-medallion cab carrying three male passengers in front of 256 West 145th Street in Manhattan. The cab was selected because it was the third one encountered, not because there was anything unusual or suspicious about it. At the officers' approach, appellant was observed to "turn around nervously and quickly look over his shoulder" and then kick something under the front passenger seat. After asking the passengers to get out of the cab, Officer Miller

recovered a "lunch style" paper bag from the floor under the rear of the front passenger seat. Upon opening the bag, the officer saw that it contained crack vials, tops for crack vials, and loose crack in a plastic bag. Appellant and the two other passengers in the cab were then taken to the precinct house.

On cross-examination, Officer Miller testified that he could not recall the number of cabs he had stopped or the number of safety pamphlets he had handed out to cab drivers during the course of the evening. He stated that, depending on the location and what hours he was working, the number of cabs stopped was "anywhere from five to some nights, probably as high as 20". The officer stated that while he had been given procedures and tactics regarding the stopping of cabs, there were no written directives. Furthermore, he was not required to "memorialize" or document the stops he made.

The taxicab driver testified that, at approximately 11:00 P.M., on July 7, 1996, he picked up three passengers at 152 Amsterdam Avenue. As he was driving with the passengers on 145th Street between 7th and 8th Avenues the police stopped his cab and told him they wanted to check it. The police told the three passengers to exit the car and patted them down. The police then looked in the car and took a bag containing drugs, which they showed him. He stated that the police let him leave because he had nothing to do with the contraband.

Appellant contends that his suppression motion should have been granted because the police stopped the livery cab without any suspicion that the occupants were engaged in wrongdoing. On a motion to suppress physical evidence, the Presentment Agency has the burden of going forward to show the legality of the police conduct in the first instance (*People v Berrios*, 28 NY2d 361, 366-367). Once this burden is met, the defendant bears the burden of proving its illegality by a preponderance of the evidence (*supra*).

The use of suspicionless fixed checkpoint stops has been upheld by the United States Supreme Court. In *United States v Martinez-Fuerte* (428 US 543, 558), the Court held that the Border Patrol's routine stopping of a vehicle at a permanent checkpoint located on a major highway from the Mexican border for brief questioning of the occupants was consistent with the Fourth Amendment. The Court held that such limited seizure is not rendered unconstitutional by the absence of individualized suspicion that the particular vehicle contains illegal aliens. Likewise, in *Michigan Dept. of State Police v Sitz* (496 US 444, 453), the Court upheld sobriety checkpoints operated pursuant to written guidelines in which "uniformed police officers stop every approaching vehicle."

By contrast, the stopping of vehicles by roving patrols on the basis of less than reasonable suspicion has met with disapproval. In *United States v Brignoni-Ponce* (422 US 873, 883-884), the Supreme Court rejected the practice as employed by Border Patrol agents on public roadways. Similarly, in *Delaware v Prouse* (440 US 648, 653), the Court invalidated stops made by roving patrols for the purpose of conducting registration and license checks.

Rulings in this State reflect this dichotomy. In *People v Scott* (63 NY2d 518, 523), the Court of Appeals endorsed the use of fixed checkpoints for the purpose of conducting sobriety checks where established according to written procedures for avoiding discrimination by stopping every vehicle (or every second, third or fourth vehicle). The Court concluded that the constitutionality of the procedure was not "affected by the shifting and temporary nature of the checkpoints." (*Supra*, at 527.) The Court emphasized that "the kind of fright or annoyance that invalidates a random stop made by a roving patrol is obviated in the case of a temporary checkpoint by the visible signs of authority which the checkpoint entails—signs announcing the purpose, lighting, and identifiable police vehicles and the observable fact that there is a uniform system for stopping cars" (*supra*, at 527, citing *United States v Hernandez*, 739 F2d 484, *cert denied* 469 US 1021; *Little v State*, 300 Md 485, 479 A2d 903).

The Court of Appeals has endorsed the use of a "roving roadblock in a uniform and nondiscriminatory manner in a sparsely populated area in which there has been a recent series of burglaries" (*People v John BB.*, 56 NY2d 482, 489, *cert denied* 459 US 1010). In that case, three police vehicles were used to stop *every* car encountered for the purpose of interviewing all persons about the burglaries. The Court reasoned, in a footnote, that the investigative method employed "eliminates any element of arbitrariness in the decision to apply the procedure to a particular vehicle or individual" (56 NY2d, *supra*, at 489, n).

The procedure employed in the instant matter leaves far too much to the unfettered discretion of the individual officer in selecting which vehicle to stop for the purpose of detaining and questioning its occupants (*United States v Santiago*, 950 F Supp 590, 596-597 [invalidating stop of taxi by the identical officers using the same procedure]). Conspicuously absent is "the administrative adoption of standards, guidelines or procedures promulgated by higher governmental officials than the police officer in the field" (*People v John BB.*, *supra*, at 490 [Meyer,

J., dissenting]). The cab in which appellant was riding was stopped by police on roving patrol in an unmarked car, not at a marked checkpoint at a fixed location (*cf., People v Serrano*, 233 AD2d 170, *lv denied* 89 NY2d 929 [every vehicle stopped by roving roadblock]). The officers neither relied upon a written directive to select which vehicles to stop nor documented the selection method actually employed. Thus, "there was no indication that the cab was stopped pursuant to a routine systematic procedure conducted according to rules or guidelines providing for nonarbitrarily selected vehicle stops (*cf., People v Scott*, 63 NY2d 518)" (*People v Concepcion*, 216 AD2d 141, 142, *lv denied* 86 NY2d 792). As we noted in *People v Concepcion*, presence in a particular geographic area, such as one known for a high incidence of crime, or participation in a particular activity, such as riding in a livery cab, does not, without more, support a finding of reasonable suspicion of criminal activity (*supra*). Therefore, we cannot agree with the dissenter's conclusion that the stop, in a high-crime area, of an occupied cab is justified.

Nor can the method employed be said to be "minimally intrusive". To the contrary, it fails to meet the criterion enunciated by the United States Supreme Court in *United States v Martinez-Fuerte* (428 US 543, *supra*). As the Court pointed out (at 558), while the "objective intrusion" of a roving stop—questioning occupants and visually inspecting the vehicle—is the same, "the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." Moreover, the avowed purpose of stopping the vehicle to give the driver a safety pamphlet is no less pretextual than that of conducting a license and registration check, struck down in *Delaware v Prouse* (440 US 648, *supra*). Finally, the officers' practice of stopping only occupied taxi cabs indicates that their interest was to observe the passengers, not to educate the drivers about safety issues. Concur—Rosenberger, Rubin and Tom, JJ.

Sullivan, J. P., dissents in a memorandum as follows: As the testimony shows, the police stopped the taxicab in question as part of the operations of the Taxi-Livery Robbery Task Force, a plainclothes unit formed in 1992 to concentrate on crimes against taxicab drivers, who, according to statistics, were the victims of 3,600 assaults, robberies and homicides in 1992.

Concededly, there was no reasonable suspicion to justify the stop involved. Police Officer Miller testified that on the night in question he was working a 6:00 P.M. to 2:00 A.M. tour, the "high crime" hours, in the Manhattan North precinct, "looking for

street crimes and also taxi robberies." As the officer testified, the Police Department permitted the stopping of cabs as long as it was done on "a set basis and not just arbitrarily". When a cab was stopped, the officers would give the driver a pamphlet containing safety guidelines.

On the evening in question Miller and his partner planned to stop occupied cabs on a one in three basis. At about 11:00 P.M., they stopped a gypsy cab in front of 256 West 145th Street in Manhattan. Other than it being the third cab, there was nothing unusual about it. The police captain who headed the taxi unit testified that he left it to the discretion of the officers on patrol as to whether to stop "every second, third, fifth taxi." There are no quotas as to how many taxi stops should be made in any given tour.

Since only the legality of the stop is at issue, the question is whether the Police Department policy, as implemented here, passes constitutional muster. The United States Supreme Court has held that, under certain circumstances, the police may, despite the absence of probable cause or reasonable suspicion to believe that the car or its occupants were involved in a crime, stop a motor vehicle for investigative reasons. (*See, Delaware v Prouse*, 440 US 648; *United States v Brignoni-Ponce*, 422 US 873.)

In New York, the Court of Appeals has approved of investigatory automobile stops made "pursuant to a nonarbitrary, nondiscriminatory and uniform procedure" that serves a legitimate function. (*People v John BB.*, 56 NY2d 482, 488, *cert denied* 459 US 1010.) The validity of these stops, where no indicia of criminal activity is present, is to be determined on reasonableness and on a case-by-case basis, balancing the level of intrusion against the State's interest in the inquiry and taking into account the range of discretion afforded to police officers in question. (*See, People v Spencer*, 84 NY2d 749, *cert denied* 516 US 905; *People v Scott*, 63 NY2d 518; *People v John BB.*, *supra*.)

Stopping a pre-determined proportion of occupied cabs for a safety check in specified high-crime areas during a particular time frame is a minimally intrusive method of affording a measure of protection to a group of vulnerable and endangered citizens, who are identifiable by occupation. Such a limited stop is much less intrusive than a roadblock at a particular location, which would entail a stop of every vehicle entering the area. Moreover, the legality of the stop ought not turn on whether the police policy is verbal or written or that the procedure had a roving aspect to it as long as, as is the case here,

the policy is a fixed one. The testimony of the police officers was sufficient to establish that "the cab was stopped pursuant to a routine systematic procedure conducted according to rules or guidelines providing for nonarbitrarily selected vehicle stops." (*People v Concepcion*, 216 AD2d 141, 142, *lv denied* 86 NY2d 792; *see also, People v Boswell*, 255 AD2d 173 [decided herewith].)

I would affirm the order adjudicating appellant a juvenile delinquent.