■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v KEITH BOSWELL, Respondent. [683 NYS2d 471] —Order, Supreme Court, Bronx County (Robert Cohen, J.), entered on or about March 13, 1997, which, to the extent appealed from as limited by appellant's brief, upon reargument, adhered to its initial order, dated October 25, 1996, granting defendant's motion to suppress physical evidence, reversed, on the law, the motion to suppress denied and the matter remanded for further proceedings.

Defendant was indicted for two counts of criminal possession of a controlled substance in the third degree after the police stopped the taxi in which he was a passenger, and recovered drugs from a bag that they observed him kicking under the passenger seat. Defendant moved pre-trial to suppress the physical evidence recovered from the vehicle. Police Officer Ray Winslow testified at the suppression hearing that he was assigned to the Taxi Livery Task Force, where his duties included setting up taxi checkpoints, stopping cabs, and handing out literature containing safety tips to drivers. Winslow stated that the normal procedure required the presence of a supervisor at the checkpoint, and the stopping of every third taxi. It was the supervisor's responsibility to set the exact procedure and location of the checkpoint. To Winslow's knowledge, there were no written guidelines.

On February 27, 1995, at approximately 9:00 P.M., Winslow and his partner, Sergeant Thomas Galati, parked their unmarked patrol car at 139 Exterior Avenue. When the third taxi passed, they pulled their car out, placing on the turret light. They caught up to the taxi approximately a half a block later, and pulled it over. As the officers approached the taxi, they observed defendant kicking a bag under the seat. In response to the officer's questions as to whether the bag was his, defendant first responded "what bag," and then denied ownership of it. The police searched the bag and recovered drugs, money and two walkie talkies.

In a decision dated October 25, 1996, the suppression court

granted defendant's motion to suppress, concluding that the stop of the cab was unlawful since the People failed to produce any evidence of a written, systematic procedure limiting the officers' discretion in conducting the checkpoint stop. The People moved for reargument based on this Court's intervening decision in *People v Serrano* (233 AD2d 170, *lv denied* 89 NY2d 929). In *Serrano* (*supra*, at 171), we upheld a checkpoint stop as "nondiscriminatory and nondiscretionary," and specifically stated the procedure utilized was not invalid merely because it was not in writing. The suppression court granted reargument but adhered to its initial determination. The court distinguished the checkpoint stop in *Serrano*, since there, six to eight officers were involved, the checkpoint was visible to motorists and there was no pursuit of any vehicle. The court concluded that the stop in this case was more akin to a random patrol stop, and as such, required reasonable suspicion by the police that the driver was committing a traffic violation or that an occupant was engaging in criminal activity.

While it is beyond question that a roadblock stop constitutes a seizure within the meaning of the Fourth Amendment (*People v Scott*, 63 NY2d 518, 524; *People v John BB.*, 56 NY2d 482, *cert denied* 459 US 1010; *Delaware v Prouse*, 440 US 648), it is likewise accepted that there is a diminished expectation of privacy in an automobile (*People v Scott, supra*, at 525; *United States v Martinez-Fuerte*, 428 US 543, 556). Thus, "individualized suspicion is not a prerequisite to a constitutional seizure of an automobile which is 'carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers' " (*People v Scott, supra*, at 525, quoting *Brown v Texas*, 443 US 47, 51).

The reasonableness of such a seizure must be judged "by balancing its intrusion on the Fourth Amendment interests of the individual involved against its promotion of legitimate governmental interests" (*People v Scott, supra*, at 525; *see also*, *People v Spencer*, 84 NY2d 749, 754, *cert denied* 516 US 905). The key factors in this analysis "are the governmental interest involved and the effect of the procedure in relation to it" on the one hand, and "the degree of intrusion of the procedure on the individual subjected to it, measured in terms of both its subjective effect and the degree of discretion vested in the officials charged with carrying it out" on the other (*People v Scott, supra*, at 525; *see also, People v Spencer, supra*, at 754).

Balancing these factors, we conclude that the procedure utilized by the police in the instant case does not exceed constitutional limits, and is consistent with governing prece-

dent. The testifying officer stated that he was a member of the Taxi Livery Task Force, whose unit had a specific program of stopping taxis at checkpoints in order to hand out safety literature. The governmental purpose of protecting taxi drivers and their passengers from criminal activity is patent. Moreover, the procedure, overseen by a supervisor, called for the "nondiscriminatory and nondiscretionary" stopping of every third taxi observed (*People v Serrano, supra,* at 172). Officer Winslow testified that, consistent with this procedure, the vehicle in which defendant was riding was the third taxi observed, and therefore was stopped. As the officer's testimony regarding the checkpoint program and the circumstances surrounding the stop in this case stands uncontradicted in the record, the suggestion that the officers acted with unbridled discretion in stopping the subject vehicle is rejected (*People v Serrano, supra,* at 171). Moreover, the absence of written guidelines from the higher echelons of the Police Department does not automatically render a checkpoint program invalid where the procedure adopted is uniform and nondiscriminatory (*supra,* at 171).

Additionally, the fact that this checkpoint involved minimal pursuit does not render it constitutionally impermissible. In *People v John BB.* (*supra*), the Court of Appeals upheld the employment by police of a roving roadblock in a rural area where many burglaries had recently occurred. The procedure in *John BB.* called for the stopping of every vehicle in the area in order to ascertain the identity of the occupants, and to obtain information about the burglaries. The Court found the suspicionless stops permissible since they were accomplished pursuant to a "nonarbitrary, nondiscriminatory and uniform procedure" (*supra,* at 488). Although the present procedure involved the stopping of every third car, instead of every one, that fact does not affect its validity so long as a "specific nondiscriminatory pattern of selection i[s] called for" (*People v Scott, supra,* at 526). While *Scott* involved a fixed checkpoint, we believe this rule would similarly apply to the minimal pursuit procedure involved herein (*but see, United States v Santiago,* 950 F Supp 590 [SD NY 1996]).

We acknowledge the decisions of the United States Supreme Court disapproving of roving patrol stops (*see, Delaware v Prouse, supra; United States v Brignoni-Ponce,* 422 US 873; *see also, United States v Martinez-Fuerte, supra*), but find them distinguishable. In *Delaware v Prouse* (*supra*), the defendant's vehicle was stopped by a Delaware patrolman who testified that he stopped the car solely to check the driver's license and

registration. The patrolman was not acting pursuant to any department guidelines or standards, but rather characterized the stop as " 'routine' " (*supra,* at 650). In *United States v Brignoni-Ponce* (*supra*), the procedure at issue was the asserted authority of Border Patrol agents to stop at random any vehicle near an international border to determine if it contained illegal aliens or was involved in smuggling operations.

As should be plain, these roving-patrol procedures are characterized by the unlimited discretion afforded the government officials involved. Far from being systematic, they apparently were developed by the officers in the field on an ad hoc basis. They had no objective mechanism to limit the officers' discretion, nor did they profess to. In contrast, the procedure at issue incorporated many of the features of the traditional fixed checkpoint—the required presence of a supervisor, the fixed location of the police vehicle and a systematic selection process for stopping cars. In view of these similarities, that the police vehicle may not have been completely visible, and that the police car pursued the taxi for a short distance, does not tip the balance toward unreasonableness (*see, People v John BB., supra*; *cf., Delaware v Prouse, supra*; *United States v Brignoni-Ponce, supra*).

We further find *Matter of Muhammad F.* (235 AD2d 168 [decided herewith]) distinguishable from the instant case. In *Muhammad F.* (*supra*), this Court found that a police roving-patrol program whereby one out of every three occupied taxi or livery cabs would be stopped for "safety checks" was constitutionally infirm. We stated that the procedure gave the police far too much discretion in choosing which vehicle to stop. Here, unlike *Muhammad F.*, the checkpoint was at a fixed location, and a supervisor was always required to be present.

As defendant abandoned the bag when he disclaimed ownership, and the abandonment was not precipitated by any illegal conduct of the police (*see, People v Morales*, 243 AD2d 391, *lv denied* 91 NY2d 877; *People v Boyd*, 213 AD2d 291, *lv denied* 85 NY2d 970), the motion to suppress should not have been granted. Accordingly, we reverse and remand for further proceedings. Concur—Williams, J. P., Mazzarelli and Andrias, JJ.

Tom, J., dissents in a memorandum as follows: The issue raised on this appeal is whether a suspicionless stop of an occupied cab by officers in an unmarked police vehicle under the circumstances of this case was constitutionally permissible and valid.

Police Officer Ray Winslow, a member of the Street Crime Unit of the New York City Police Department, testified that he was working the 5:30 P.M. to 2:05 A.M. tour on February 27, 1995, and was assigned to the Taxi Livery Task Force in the 44th/46th Precinct. He explained that the Task Force is sent out to precincts with a high number of cab robberies, where its duties are to set up taxi check points, stop cabs, and hand out safety tips and other literature to cab drivers. A supervisor is supposed to be present at checkpoints and "usually" every third cab is stopped. The number, which "is different sometimes," was possibly selected by the supervisor, but Winslow was "not exactly sure," and he was unaware if there were criteria for the ratio selected.

On that date, Winslow was teamed with Sergeant Thomas Galati, who was the supervisor. Galati was not called by the People, so that the record does not contain further information about departmental policy, if any, concerning the selection criteria for cab stops. Both officers were in plainclothes; both sat in an unmarked police car secreted in the vicinity of 725 Exterior Avenue in the Bronx. At approximately 9:00 P.M., they pulled over the first cab of the evening, which was the third cab in sequence observed by the officers. This cab contained defendant as a passenger, leading to his arrest, as is related in the majority's decision. On cross-examination, Winslow testified that he had not been given a specific location to locate the unmarked car, a choice that was basically up to the Sergeant and himself. The direction to stop every third cab was only verbally relayed; there was no written policy. Winslow conceded defense counsel's observation that this was not a classic checkpoint, in that there was no marked police vehicle in a stationary position, at which location officers direct cars to pull over for a registration or DWI check. Here, the unmarked police car was parked on the side of the road at night, presumably out of sight of moving vehicles, awaiting passing cabs. Although Winslow indicated that they were stationary, they nevertheless operated by letting the targeted cab pass them first, after which the officers would follow, with turret light lit, and pull the cab over.

The stop in this case was pursuant to the New York City Police Department's Taxi Livery Task Force program that has been criticized on Fourth Amendment grounds by other courts (see, e.g., United States v Santiago, 950 F Supp 590). In Matter of Muhammad F. (255 AD2d 168 [decided herewith]), we analyzed this program in the context of Federal and State constitutional law allowing stops, unsupported by reasonable suspicion, of

cabs and other vehicles at fixed locations and "roving road-blocks". The facts in *Muhammad F.* bore a striking similarity to those in *Santiago,* to the extent that apparently the same officer was involved, and the stop and arrest in *Muhammad F.* occurred three days after that in *Santiago.* Since the policy of mobile patrols stopping cabs in *Muhammad F.* did not derive from formal guidelines, but appeared to have been formulated at the street level, documentation of stops and results was not furnished, and the officers, rather than being identified, were in an unmarked car, we found insufficient indicia of a nonarbitrary and uniform policy to satisfy constitutional standards. Although the majority relies on the supposedly fixed situs of the police car in this case to authorize the stop as a checkpoint stop, under these facts, I see that as a distinction without a real difference. Notwithstanding my sympathy with the Department's goals, I do not see how this stop can pass constitutional muster as previously articulated by this Court and the Court of Appeals.

Case law has developed an analytical model for judging the propriety of police stops of moving cars unsupported by reasonable suspicion and the policies or programs on which the stops are predicated. It is clear that a roadblock or checkpoint stop is as much of a seizure within the meaning of the Fourth Amendment as is a non-checkpoint stop of a moving car (*United States v Hensley,* 469 US 221, 226; *Delaware v Prouse,* 440 US 648; *People v John BB.,* 56 NY2d 482, *cert denied* 459 US 1010). Although individualized suspicion is not a prerequisite to a constitutional seizure of a vehicle that is carried out according to a policy or program incorporating explicit, neutral limitations on the conduct of the individual officers undertaking the seizure (*Delaware v Prouse, supra,* at 663), nevertheless, the seizure must be justified in constitutional terms. This requires that a court evaluating the legality of the stop and seizure balance the consequential intrusion into the individual's Fourth Amendment interests against the promotion of legitimate governmental interests (*People v John BB., supra,* at 487; *People v Scott,* 63 NY2d 518, 525; *Delaware v Prouse, supra,* at 657). The intrusion is characterized as both objective and subjective. The subjective intrusion would be measured in terms of the anxiety or inconvenience experienced by the individual being stopped; the objective intrusion is the stop itself (*United States v Santiago,* 950 F Supp 590, 595, *supra*). The analysis balancing these interests requires a preliminary evaluation of the nature and extent of the governmental interest involved, the effect of the program or policy in relation to it, and the degree of the intrusion on the individual, as measured

by the subjective effect on that individual and the degree of discretion accorded the officers under the policy (*People v Scott*, *supra*, at 525).

There are two aspects of this police program that require analysis: the extent of, and justification for, the intrusion; and the degree of discretion vested in the officers responsible for carrying out the program.

The purported goal of the program was to hand out safety pamphlets to cab drivers. It is uncontroverted that the officers were not investigating a recent or ongoing crime or preventing the imminent commission of a robbery, despite some testimonial suggestion that the officers' efforts were motivated by recent cab robberies in the vicinity. As such, the government interest in generally discouraging or investigating criminal activity, "does not implicate the same important social objectives that are at issue when police are investigating recent or ongoing suspected criminal activity" (*People v Spencer*, 84 NY2d 749, 754, *cert denied* 516 US 905). In "the absence of a crime 'afoot' " (*supra*, at 756, citing *United States v Ward*, 488 F2d 162), the People bear the burden of demonstrating the "genuine need for so immediate and intrusive an action as pulling over [a] freely moving vehicle" (*People v Spencer, supra*, at 757), especially when less intrusive alternatives are available (*supra*, at 758). Parenthetically, to the extent that the police motive was informational, the same information might have been conveyed by other means, possibly by distributing safety pamphlets to dispatchers or the like for further distribution to cab drivers, but the record is silent on whether such methods were tried or even posited.

Turning to the nature of the stop, the " 'objective intrusion * * * checkpoint stops [are viewed] in a different light [from roving patrols] because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop' " (*United States v Santiago, supra*, at 595). The *sine qua non* of a valid checkpoint, typically for license and registration or sobriety checks, at which vehicles are stopped without regard to particularized suspicion, is in the very obviousness of the police presence and purposes and its stationary nature. For instance, in *People v Scott* (*supra*) the Court of Appeals found valid a roadblock, flagged by warning signs facing traffic in both directions some 300 feet from the checkpoint, manned by two marked police vehicles with flashing turret lights, and highlighted by flares placed in the center of the road, at which all vehicles were stopped. The Court of Appeals found that

precautions as to safety, lighting and fair warning could alleviate drivers' subjective reactions caused by sudden and apparently purposeless intrusions by patrolling police. The fact that the checkpoint was moved on a regular basis to other, preselected, locations did not diminish the stationary nature of the roadblocks (*supra*). We found a roadblock to be valid where several officers, responding to a spate of neighborhood car thefts, were assigned to conduct systematic mandatory car stops on a specified corner and directed to pull over every vehicle coming down the block to check ownership papers (*People v Serrano*, 233 AD2d 170, *lv denied* 89 NY2d 929). Although generally invalidating "roving patrols" which stop vehicles without reasonable suspicion, the Court of Appeals has allowed a "roving roadblock" under narrow circumstances not present here— when police uniformly stopped all vehicles in a sparsely populated rural area in connection with recent robberies (*People v John BB.*, 56 NY2d 482, 489, *supra*).

In the present case, the People characterize the "checkpoint" as being stationary. While the record does not indicate that this was exactly the type of roving patrol that we invalidated in *Muhammad F. (supra)*, and for which suppression was required in *United States v Santiago (supra)*, it was nevertheless more akin to a mobile patrol than to a stationary checkpoint. It bears repeating that the police vehicle was unmarked and secreted in the night and, rather than stopping vehicles at the actual checkpoint, the officers, in plainclothes, were positioned so as to require a pursuit, even if a quick one, as the cab blithely passed beyond the supposedly stationary checkpoint.

Nor does the nature of the "policy" in this case instill confidence in its uniformity, in the indiscriminate nature of the selection criteria, and in its restriction of subjective motivations by the very officers carrying out the "policy." In short, there was no policy, in the sense that identified criteria were not promulgated by the central command. Rather, at best, this record suggests that the very officers carrying out the policy were the ones who were formulating it. Although deciding on different grounds, we have noted elsewhere that the fact that the Police Department allows officers to exercise discretion to stop cabs ostensibly for the safety of the drivers in the absence of reasonable suspicion of actual criminal activity does not mean that the stop thereby is justified (*People v Concepcion*, 216 AD2d 141, *lv denied* 86 NY2d 792). The present record suggests just such street-level discretion, or, at best, as characterized by the Second Department, only "an unelabo-

rated precinct directive" (*People v Vails*, 170 AD2d 550, 551) as the predicate for the stop. By contrast, in *People v Scott* (*supra*), the County Sheriff's office had established a written policy, incorporating objective criteria (every car was stopped) and selecting the actual checkpoints as well as the time periods of operation and of rotation among the checkpoint sites. The officers in *Scott* conducting the stops had virtually no discretion as to whom to stop. This is not to suggest that all discretion ought to be removed from the officer at the scene, or that a policy, to be valid, must be in writing (a requirement that we declined to adopt in *Serrano*) but those circumstances have been identified by the Court of Appeals as factors enhancing the nonarbitrariness required by constitutional standards. It bears repeating that the supervisory officer who was on the scene might have clarified the parameters and formality of the policy, but he was not called as a witness by the People.

The People contend that the selection of an objective number (stopping one in three cabs) somehow makes the selection sufficiently neutral to insulate each stop from the officer's unfettered discretion. The Southern District, examining the very argument advanced in the present case, characterized this logic as "plainly wrong" (*United States v Santiago, supra*, at 596). In that case, as in this case, there were no written rules, either the individual officers or unidentified persons in the precinct decided where and when to conduct stops, there was no reporting regarding the stops, there was no oversight as to whether stops were truly conducted in a neutral manner, and the patrols seemed to have been conducted disproportionately at night. All of this undermined the ostensible informational motive of the program. As previously noted, the informational ends in *Santiago*, as here, likely could have been accomplished with equal or even greater ease and efficiency by distributing pamphlets and making police presentations at central locations, such as taxi dispatch locations, taxi inspection stations, or through the Taxi and Limousine Commission. This is not to suggest that any of these various points should be necessary requirements in promulgating this type of program, but in the aggregate, the silence of the present record undermines the very clarity and neutrality that case law has required for vehicle stops unsupported by reasonable suspicion.

As I noted at the outset, since I cannot see how these facts can be rationally distinguished from those in *Muhammad F.* (*supra*), in which this Court requires suppression, or how a reversal in this case is in line with Court of Appeals authority, I conclude that the motion court properly construed governing

case law and properly suppressed. For that reason, I respectfully dissent.