*276 OPINION OF THE COURT
Robert Charles Kohm, J.
Defendant challenges his arrest and the seizure of physical evidence. At issue is the right of the police to stop a taxi for the purpose of handing out safety pamphlets.
A Mapp-Dunaway hearing was held on January 20, 1995. The court found the testimony of Police Officer Rakesh Verma to be highly credible. At such hearing, the court made the following findings of fact:
On July 4, 1994, Police Officer Rakesh Verma and Detective Hickey, both of the 104 Robbery Squad Precinct, were on patrol duty in Queens. They were dressed in plain clothes and rode in an unmarked car. This team was temporarily assigned to the Taxi Livery Robbery Task Force. Their assignment, for a period of 30 days, was to conduct a safety check on cabs, giving them advice on the services rendered by the Police Department to taxicabs and advising them of hazardous conditions within their industry. Their major duty consisted of stopping cabs and issuing a departmental pamphlet, entitled "Safety Tips for Cab Drivers”. In addition, they would advise taxi drivers that plainclothes officers were present in the area and if assistance was needed, they could request help.
At approximately 3:00 a.m., the officers were in the vicinity of 113th Street and Farmers Boulevard performing their duty of stopping cabs. At that time, Officer Verma observed a moving 1986 Ford vehicle bearing a taxicab license plate. Two people were in the rear. The officers, who had previously stopped three other cabs, made a U-turn and drove behind the taxi. For a short while they flashed their lights and sounded their siren for the purpose of pulling the taxi over.
The taxi responded by slowing down and pulling to the curb. As it did so, the passenger in the right rear seat opened the car door and fled into the night. Once the taxi stopped, a few seconds later, the other passenger opened the left rear door and exited, moving rapidly to the rear of the taxi. Officer Verma promptly stopped him.
The officer noted that the left car door was still open and looked inside the taxi. He observed a handgun on the left rear floorboard. The passenger, who is the defendant in this action, was placed under arrest for possession of a gun. He was handcuffed and searched. A substance resembling crack cocaine was found in a plastic change purse in his left rear pocket, as was a plastic bag of marihuana, located in the right *277 front pocket. Defendant now challenges the initial stopping of the taxi, the ensuing search of the vehicle, the seizure of the gun and both drugs. He alleges a lack of probable cause to justify a vehicle stop.
I
FEDERAL CASES
The earliest pertinent case dealing with automobile stops was Carroll v United States (267 US 132) which dealt with "transporting in an automobile intoxicating spirituous liquor * * * in violation of the National Prohibition Act” (supra, at 134). Although this act has long since been repealed, the Fourth Amendment principles set forth in that case still constitute basic law. The Carroll Court held: (1) That because of the mobility of a car, a vehicle may normally be searched without a warrant (supra, at 153-154); (2) That the lack of a warrant does not nullify Fourth Amendment requirements of probable cause (supra, at 156); (3) That the search of a car may be justified as to reasonable cause if the seizing officer could support a belief that the contents of the auto offended the law (supra, at 160-161).
Subsequently, probable cause to search an automobile was extended to any grounds which would justify the arrest of the occupants of the car (see, Chambers v Maroney, 399 US 42).
With the passage of time, it became apparent to the Federal courts that police authorities had virtually as many reasons to stop cars as they had to halt pedestrians. A more complex reason for halting vehicles arose from investigative stops. These car stops sprang from police experience and dealt with situations in which the "officers making the stop have neither probable cause to believe nor reasonable suspicion that either the automobile or its occupants are subject to seizure under the applicable criminal laws.” (Delaware v Prouse, 440 US 648, 655.) This form of police interference was first permitted in international border situations when the Supreme Court ruled that border patrol agents were permitted to halt any vehicle at random for the purpose of determining whether it contained illegal aliens or was involved in smuggling operations (see, United States v Brignoni-Ponce, 422 US 873). The rationale for this border stop was "because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border” (supra, at 881).
*278 Thus, the Supreme Court recognized the fact that under some circumstances an initial auto stop may result from police initiative rather than suspicious actions on the part of the driver.
II
NEW YORK CASES
Turning to the present matter, defendant alleges that none of his actions brought him into the police zone of scrutiny. As far as the investigating officers were concerned, he was simply one of two passengers in a nighttime taxi. His presence was totally innocuous. Further, the taxi driver was not a subject of police suspicion in any fashion. This being the case, defendant maintains that the authorities had no probable cause to stop the taxi and the ensuing searches and seizures were tainted as fruit of the poisonous tree. As regards the initial taxi stop, defendant argues that this was the equivalent of a roadblock and whatever justification the police might have possessed was nullified by the lack of specific guidelines governing such a form of intrusion.
In considering this roadblock argument, it is clear that our State courts, before Delaware v Prouse (supra), regarded even a "routine” traffic check as a violation of the Fourth Amendment, justified only by a reasonable suspicion of violation of the traffic laws or by highway safety reasons which permitted inspections in a nonarbitrary, uniform and systematic way (People v Ingle, 36 NY2d 413).
The Court of Appeals, in People v John BB. (56 NY2d 482), explored the nature of uniform and nonarbitrary car stops. That case dealt with a series of summertime burglaries in a remote rural region. Due to the nature of the crime, the local police began a surveillance of the area and uniformly stopped vehicles travelling in that neighborhood. One of these stops produced possible evidence linking the defendant with the burglaries. Defendant moved to suppress such evidence on the ground that the initial police roadblock was illegal. The question considered by the Court was "whether the stop of the defendants was the type of unreasonable seizure prohibited by the Constitution.” (Supra, at 487.) The Court concluded that the original stop was not based on the desire to harass or mere whim, but rather on reasonable facts which justified a roving roadblock conducted in a uniform and nonthreatening manner. Hence, the motion to suppress was denied.
*279 The present case falls within the police discretionary stop scenario discussed in People v John BB. (supra). Defendant is justified in his belief that neither his personal actions nor the cab driver triggered the disputed stop. Further, the cases are uniform in holding that such a stop was a limited seizure subject to constitutional limitations. While the police were not seeking information about a crime, they were engaged in administrative duties which involved assisting taxicabs. This administrative safety program required the officers to halt taxis, explain the duties of the Taxi Livery Task Force, and issue brochures entitled "Safety Tips for Cab Drivers”. The evidence before this court indicates that although this assignment was a temporary one, it was still for a 30-day period. In addition, the officer testified that he had received instructions and training by Street Crime personnel which focused on robberies involving taxicabs and limousines. In this respect, the record indicates that part of Officer Verma’s duties was advising the local taxicab drivers that a special police unit called "Street Crime” was in existence which dealt strictly with the taxicab industry.
Basically then, the evidence reveals that the taxicab in this case was not a target of police investigation, nor was the defendant. Rather, we are dealing with nontarget auto stops in which the police, on administrative orders, halt cars for specific purposes. A recent case in this area is People v Spencer (84 NY2d 749), in which case the Court was faced with the issue of "whether the police may stop a moving vehicle in order to request information of the driver concerning the whereabouts of a criminal suspect.” The facts indicated that the police were investigating an assault and were advised by the complainant that a friend of the alleged perpetrator could assist them. The officers observed the friend driving a car and stopped the vehicle to question him and found a gun. The Court of Appeals ruled that the friend was not a target of police inquiry and under these circumstances, the stop was unreasonable. The Spencer Court reiterated the doctrine that a car stop was a seizure and the reason for such a seizure must be legally justified.
Applying the above reasoning to the present case, this court finds that the stop in question is governed by its "reasonableness” (People v Scott, 63 NY2d 518, 525). "Reasonableness” is determined by balancing the Fourth Amendment intrusion of individual interest against the "promotion of legitimate governmental interests” (supra) to arrive at a proper balance. The *280 Scott-Spencer decisions (supra) have stressed the following three factors: (A) The purpose of the stop; (B) The productivity of the stop; (C) The intrusiveness of the stop.
The court will examine the present case in light of these guidelines.
A
THE PURPOSE OF THE STOP
The stop in this case was administrative rather than investigative in nature, made for the purpose of deterring crime in the taxi-livery industry. Granted that the defendant was not a target, the police still had a legitimate reason to speak to the taxi driver. This involved a request to pull over. Although there was no investigation of crime or suspicious behavior, the police were still performing a duty, by making a cab driver aware of specific dangers and how such harm could be minimized (cf., People v Rosario, 160 Misc 2d 1081, 1082). Prevention of crime is as necessary to law enforcement as its detection. Further, although the police had no specific training or instructions on how to advise cab drivers, they were trained in crimes pertaining to robberies and assaults within the taxi industry. Since their major task involved handing out pamphlets, much had to be left to the officers’ own discretion. Thus, the facts indicate that the police were pursuing legitimate governmental aims in raising the taxi drivers’ "perception of the risk” (see, People v Scott, supra, at 527) involved in driving in a specific Queens area.
B
THE PRODUCTIVITY OF THE STOP
The defendant next challenges productivity of the stop, pointing out that the prevention of a livery car robbery is, at most, tenuously related to the handing out of safety brochures. Further, defendant maintains that there was no testimony at all as to the effectiveness of this particular form of police procedure. Both of these points are valid and would be relevant if the prevention of crime was measured by cost effectiveness, but such is not the case. Our courts have held that efficiency is not a major factor when the purpose of a program is the deterrence of crime. As was pointed out in People v Scott (supra, at 528-529), "[t]he State is entitled, in the interest of public safety to bring all available resources to *281 bear, without having to spell out the exact efficiency coefficient of each component and of the separate effects of any particular component”.
Therefore, the effectiveness of the police officers’ actions is not a major factor in the present case.
C
THE INTRUSIVENESS OF THE STOP
The defendant argues that the police action in this case was simply a roadblock or a safety check, permitting the halting of any taxi at random. As such, defendant reasons that the police were not performing their duty in a nonarbitrary, uniform and systematic manner. Basically, it is contended that the police were utilizing a safety pamphlet as a search warrant in violation of the Constitution.
While the police in this case had authority to stop taxis for safety warnings, a review of the facts indicate this authority was both limited and used with discretion. The stop in this case was not a roadblock; the police did not target a specific intersection in Queens and stop every passing taxi. The courts have held forth that a roadblock occurs when every car at a given location is halted during a specific period of time (see, People v Scott, supra, at 523, 524). Nor was it an investigatory stop to determine or deter potential law violations (see, People v Ingle, 36 NY2d 413, supra). This case differs from People v Snead (160 Misc 2d 466) and People v Collura (160 Misc 2d 831) in which the police set up roadblocks at a specific location for the possibility of investigating possible driver intoxication. Rather, the purpose of this case was strictly preventive— warning taxi drivers of possible dangers and assisting them in a practical fashion. These warnings were administered only to taxis in a general area. The cab in question was only the fourth car halted in approximately five hours. It must be kept in mind that although this was the major duty imposed upon the officers that night, they still had their normal tasks to perform. Nor is there any indication that the police intended to stop the taxi for any other purpose than the safety warnings. The pamphlet was not a pretext but a valid instructional aid.
Finally, as regards the taxi stop, the evidence shows that the police were aware of the intrusive nature of their actions and deliberately sought to avoid creating an emergency situation, not wanting to scare the other cars. This would indicate *282 that the police action was not based on whim, but on planned administrative procedure. Considering all of these elements, the facts indicate a restrained limited use of police authority for a valid purpose which produced car stops in a uniform and nonarbitrary manner.
Therefore, evaluating the above facts, this court concludes that the nontarget stop was part of a valid but limited safety program aimed at reducing crime in the taxi field. This program was part of a deliberate police effort to assist the taxi industry. Such a program deals with individual safety and is clearly within the scope of police duties. As was pointed out in People v De Bour (40 NY2d 210, 218): "The role of the police in our society is a multifaceted one. On the one hand the police are mandated to enforce the law; yet the extent to which this authorizes the police to investigate or to prevent crime is ambiguous at best. On the other hand, and more important, we must recognize the multiplicity and complexity of tasks assumed by the police. As public servants, the police perform the lion’s share of services expected of local government. Among other functions, the police in a democratic society are charged with the protection of constitutional rights, the maintenance of order, the control of pedestrian and vehicular traffic, the mediation of domestic and other noncriminal conflicts and supplying emergency help and assistance * * * To consider the actions of the police solely in terms of arrest and criminal process is an unnecessary distortion. We must take cognizance of the fact that well over 50% of police work is spent in pursuits unrelated to crime”.
Thus, the purpose of the taxi stop in this case was reasonable and promoted legitimate governmental interest. It was not, as defendant contends, an intrusive roadblock but rather a regulated taxi safety stop.
Once the taxi was lawfully coming to a stop and the officer observed a man flee into the night, they had reasonable grounds to believe that something unusual had occurred. When the second passenger, the defendant in this case, similarly opened his door and exited the taxi, there was clearly a reasonable suspicion of criminal activity (People v De Bour, supra). This suspicion of criminal activity justified stopping the defendant (cf., People v Hicks, 68 NY2d 234) and looking into the open taxi, if only to see if there was an emergency situation (see, People v Mitchell, 39 NY2d 173). The sight of the gun in plain view furnished grounds for his subsequent *283 arrest and field search (People v Belton, 55 NY2d 49) which produced marihuana and cocaine.
Therefore, based on the above, this court finds that the taxi safety stop was justified and the subsequent search of the cab and seizure of the physical items was legally valid. The application to suppress the gun and drugs is denied.