OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal again presents a constitutional challenge by a defendant passenger to a livery cab stop pursuant to a New York City Police Department program intended to address the high incidence of cab driver robberies and homicides and promote driver safety
 
 (see Matter of Muhammad F.
 
 and
 
 People v Boswell,
 
 94 NY2d 136 [1999],
 
 cert denied
 
 531 US 1044 [2000]). Indeed, in some respects the program now before us — the Police Department’s Taxi/Livery Robbery Inspection Program (TRIP) — resembles the Department’s earlier program, which we found unconstitutional in
 
 Muhammad F.
 
 Both programs involve suspicionless stops of livery vehicles (including taxicabs) by roving patrols of police officers in plainclothes and unmarked cars. We conclude, however, that owing to its distinctive features, the TRIP stop at issue here passes constitutional muster.
 

 A Description of TRIP
 

 An owner of a registered medallion taxicab or licensed livery vehicle in New York City can choose to join TRIP, a program instituted in 1994,
 
 [1]
 
 by signing a Registration Form acknowledging voluntary participation in the program. As the Registration Form provides, by joining the program the owner agrees that “the police may stop the aforementioned vehicle at any time in accordance with the Program’s guidelines. In these instances, police actions will include a brief inquiry of the driver and vi
 
 *15
 
 sual inspection of the vehicle.” A vehicle owner also agrees that any driver using the enrolled vehicle will sign a consent form containing a similar acknowledgment.
 

 Participating owners are given identical, numbered decals to be affixed to their vehicles, one on each rear side window and one conspicuously within the rear passenger compartment where the passenger can read it. The decals, bearing the New York City Police Department logo, state in English and Spanish: “this vehicle may be stopped and visually inspected by THE POLICE AT ANY TIME TO ENSURE DRIVER’S SAFETY.” A Vehicle owner may discontinue participation in the program by removing the TRIP decals and notifying the precinct of record.
 

 Under TRIP guidelines, spelled out in the Police Department’s Operations Order No. 46, members of the police force on patrol, including those in plainclothes, may briefly stop and visually inspect a vehicle bearing TRIP decals. If at the scene the driver consents, the police may open the passenger compartment doors. Vehicle occupants may not be removed during the stop unless independent factors cause the officers to fear for their own safety, and the police may not ask passengers wishing to leave for identification or otherwise detain them in the absence of reasonable suspicion of criminal activity. The police are required to maintain a detailed activity log of all TRIP stops, including information regarding the driver and the vehicle stopped.
 

 Defendant’s Encounter with TRIP
 

 In June 1996, Louis Escaño, owner and driver of a livery cab, enrolled in TRIP. Around 3:40 p.m. on July 19, 1996, in response to a radio call, Escaño picked defendant up in Manhattan. Over the course of the next several hours, as instructed by defendant, Escaño stopped at several locations for short intervals, during which defendant left and returned to the vehicle. At about 8:00 p.m., while it was still light outside, Officer James McSwigin, who was on patrol in an unmarked police car with two other plainclothes officers, saw a TRIP decal on Escano’s vehicle, and briefly activated a siren and flashing lights.
 

 After signaling the car to stop, McSwigin observed defendant, in the right rear passenger seat, look over his shoulder and then gesture as if to direct Escaño to continue on. The officer re-activated his siren and followed the car until it stopped. As McSwigin exited his vehicle, he observed defendant lean toward the floor of the car and bend down. Defendant then sat
 
 *16
 
 up and. threw something onto the front seat, which led McSwigin to suspect that defendant had a weapon. Concerned for his safety, McSwigin opened the cab’s left rear passenger door, in order to have an unobstructed view of defendant. On the left-hand rear passenger side of the car, in the direction defendant had leaned, the officer saw an open black nylon bag that contained a greenish plastic wrapped around part of a brick, which he recognized as a way of packaging cocaine. He signaled to his partner, positioned at the opposite passenger door, who asked defendant to step out of the vehicle. As he was leaving the car, defendant volunteered, “it’s not mine” and “it’s not my coke.”
 

 Charged with criminal possession of a controlled substance in the first and third degrees, defendant challenged the stop; the seizure of the black nylon bag containing 10 kilograms of cocaine, and a paper bag found in the front seat of the cab containing $9,284 in cash; the voluntariness of his statements to the police; and his arrest. Following a
 
 Mapp-Huntley
 
 hearing, the court found TRIP constitutional, Escano’s participation voluntary, the opening of the passenger door supported by reasonable suspicion, the drugs in plain view, defendant’s statements spontaneous and voluntary, and the arrest supported by probable cause (171 Misc 2d 744). Defendant then pleaded guilty to criminal possession of a controlled substance in the second degree, and was sentenced to a term of 8V3 years to life. The Appellate Division affirmed (279 AD2d 399), and a Judge of this Court granted leave to appeal.
 

 The Law Relating to Stops
 

 Automobile stops, which constitute seizures for Fourth Amendment
 
 [2]
 
 purposes, historically have been founded upon an officer’s reasonable suspicion of illegal activity
 
 (People v Sobotker,
 
 43 NY2d 559 [1978]). Suspicionless stops, however, may be upheld where reasonable, determined by balancing “the public interest and the individual’s right to personal security free from arbitrary interference by law officers”
 
 (Brown v Texas,
 
 443 US 47, 50 [1979] [internal citations and quotation marks omitted]). For evaluating the validity of a particular stop,
 
 Brown
 
 offers a three-part balancing test: the gravity of the public concerns served by seizure of the vehicle, the degree to
 
 *17
 
 which the seizure advances the public interest and the severity of interference with individual liberty
 
 (id.
 
 at 50-51). That test has been applied by the Supreme Court and this Court to review suspicionless automobile stops, including by roving patrols
 
 (Michigan Dept. of State Police v Sitz,
 
 496 US 444 [1990];
 
 Delaware v Prouse,
 
 440 US 648 [1979];
 
 United States v Brignoni-Ponce,
 
 422 US 873 [1975];
 
 Muhammad F.,
 
 94 NY2d 136;
 
 People v Spencer,
 
 84 NY2d 749,
 
 cert denied
 
 516 US 905 [1995]).
 

 Most relevantly, in
 
 Muhammad F.
 
 this Court, applying the
 
 Brown
 
 balancing analysis, concluded that random, suspicion-less stops of livery cabs pursuant to the New York City Police Department program predating TRIP were unreasonable and thus unconstitutional. Under that predecessor program, the New York City Taxi-Livery Task Force made suspicionless stops of livery cabs in targeted neighborhoods to provide the drivers with pamphlets containing safety information, inquire as to their safety and simultaneously observe the passengers’ reactions. The police routinely asked passengers to step out of the vehicles and searched cab interiors. Stops were wholly within the officers’ discretion, with no written guidelines or records of stops made.
 

 While not doubting the gravity of the public concern served by the program, we concluded that the stops pursuant to this program were invalid, noting the failure of proof that less intrusive or discretionary means were unavailable to achieve the stated objective. Moreover, we found the stops excessively intrusive, measured both objectively (passengers routinely were directed to step out of the cab while the officers searched it) and subjectively (the stops were of a type that could well frighten lawful travelers). Finally, no attempt was made to satisfy the constitutional requirement that the stops be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers
 
 (Muhammad F.,
 
 94 NY2d at 146-148;
 
 see also United States v Santiago,
 
 950 F Supp 590 [SD NY 1996]).
 

 TRIP, by contrast, properly balances the competing interests under
 
 Brown.
 
 In that the acute public interest in preventing crime against livery cab drivers remains unchallenged—
 
 Brown’s
 
 first factor — we begin our analysis by considering the degree to which the seizure advances the public interest (the “effectiveness” factor). In
 
 Muhammad F.,
 
 we were troubled by the lack of evidence of the effectiveness of conducting random, suspicionless patrol stops, as opposed to less intrusive methods,
 
 *18
 
 particularly given the “elevated potential intrusiveness and * * * greater opportunities for the unlimited exercise of discretion by police” implicated by such stops
 
 (Muhammad F.,
 
 94 NY2d at 146).
 

 Under TRIP, however, the officers’ discretion in the field is significantly constrained by the limitation of the program to participating vehicles. Stops, in that sense, are not truly “random.” Only livery cab owners and drivers who feel vulnerable will elect to participate, as opposed to programs that subject all vehicles to random, suspicionless stops at the unchecked discretion of an individual officer
 
 (see Prouse,
 
 440 US at 659-660;
 
 Spencer,
 
 84 NY2d at 758-759). Moreover, to the extent that an enrolled vehicle owner decides the program’s intrusiveness outweighs its intended benefits, or that potential passengers are discouraged from entering the cab, the owner can opt out of the program. In this case, the testimony demonstrates that, for Escaño, TRIP was effective. In his words, “at times you wish to be stopped.”
 

 The structure of the program and the restrictions imposed on police officers by the Operations Order also significantly reduce the intrusiveness of stops, both objectively and subjectively
 
 (Brown’s
 
 third factor). Only participating vehicles may be stopped. Vehicle occupants may not be removed or questioned during stops; absent independent reason to detain them, they are free to leave without being asked to provide identification. Additionally, by contrast to the New York City police program reviewed in
 
 Muhammad F.,
 
 TRIP requires the police to complete a detailed activity log for every stop made, which affords the possibility of “post-stop judicial review” to the extent questions are raised as to the actual operation of the program
 
 (United States v Martinez-Fuerte,
 
 428 US 543, 559 [1976]). The police also maintain a registration log of all vehicles participating in the program.
 

 Subjective concerns, such as the potential for fear on the part of passengers, are mitigated by the consent of the driver and the display of decals that notify passengers that the vehicle might at any time be stopped and visually inspected by the police. In other contexts, including the search of a vehicle, consent alone may satisfy Fourth Amendment concerns
 
 (see e.g. Florida v Jimeno,
 
 500 US 248 [1991];
 
 Schneckloth v Bustamonte,
 
 412 US 218 [1973]; Kamins, New York Search & Seizure, at 429-436 [12th ed];
 
 cf. People v Battaglia,
 
 86 NY2d 755 [1995]). Under TRIP, a passenger unwilling to assume the risk of a stop can simply pass up a car participating in the program.
 

 
 *19
 
 In
 
 United States v Woodrum
 
 (202 F3d 1 [1st Cir],
 
 reh and reh en banc denied
 
 208 F3d 8 [1st Cir],
 
 cert denied
 
 531 US 1035 [2000]), the United States Court of Appeals for the First Circuit upheld the stop of a taxicab pursuant to a 1996 Boston Police Department program, TIPS, strongly resembling TRIP.
 
 [3]
 
 In that case, the court applied the third-party consent doctrine, subject to a requirement that the actions taken pursuant to that consent had to be reasonable. The court went on to find that stops made pursuant to TIPS withstood a weighing of the public interest against passenger rights, given the obvious public interest in preventing crime against taxicab drivers, the limitations on police discretion in making TIPS stops, and the relatively modest intrusion on passengers’ liberty in light of the brevity of the stops and the notice of the program.
 

 In this case, defendant contends that because a taxicab passenger has an independent expectation of privacy, the stop cannot be justified under third-party consent principles
 
 (cf. United States v Matlock,
 
 415 US 164 [1974];
 
 see also People v Gonzalez,
 
 88 NY2d 289 [1996];
 
 People v Cosme,
 
 48 NY2d 286 [1979]). Because we conclude that this stop was reasonable under a
 
 Brown
 
 analysis, we need not separately determine whether the third-party consent doctrine alone would validate the stop.
 
 [4]
 

 Finally, defendant’s challenge to the legality of the stop based on the location of the TRIP decals on Escano’s car is unpersuasive. Given that the decals primarily serve to mitigate the subjective intrusiveness of a TRIP stop, the passenger’s constructive, rather than actual, notice of the TRIP program is sufficient. In this case, we need not contemplate the implications of the omission of a TRIP decal in the passenger compartment interior. Defendant’s notice of the TRIP program can be imputed as a matter of law from the facts of this case even in the absence of the decal in the passenger compartment.
 

 
 *20
 
 Defendant’s remaining arguments, which involve mixed questions of fact and law, are beyond further review by this Court inasmuch as the lower court determinations are supported by evidence in the record.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Judges Smith, Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order affirmed.
 

 [1]
 

 . TRIP was a direct response to a rash of murders and robberies of cab drivers in 1992 and 1993, including two murders in one weekend. In 1992 alone, there were 3,600 reported robberies of taxicab drivers in New York City (see
 
 Muhammad F.,
 
 94 NY2d at 151 [dissent]).
 

 [2]
 

 . While defendant mentions the State Constitution as an additional basis for his challenges, he offers no authority or argument why the outcome should be different under State law.
 

 [3]
 

 . The Boston program, as it existed prior to 1996, resembled the New York City program reviewed in
 
 Muhammad F.
 
 The Boston police modified the program, which lacked driver consent or notice to passengers, after stops were found unconstitutional by Massachusetts state courts (Woodrum, 202 F3d at 4;
 
 Commonwealth v Carle,
 
 4 Mass L Rptr 624 [Super Ct 1995];
 
 Commonwealth v Cosme,
 
 2 Mass L Rptr 78 [Super Ct 1994]).
 

 [4]
 

 . Courts in other jurisdictions have rejected passenger challenges to the stop of a commercial vehicle in whole or in part based on third-party consent principles
 
 (see State v Castillo,
 
 805 So 2d 393 [La Ct App 2001] [bus];
 
 United States v Hernandez-Zuniga,
 
 215 F3d 483 [5th Cir],
 
 cert denied
 
 531 US 1038 [2000] [bus];
 
 see also People v Blair,
 
 321 Ill App 3d 373, 748 NE2d 318 [App Ct],
 
 appeal denied
 
 195 Ill 2d 582, 755 NE2d 479 [2001] [reviewing non-vehicle third-party consent seizure cases]).