OPINION OF THE COURT
Alex J. Zigman, J.
*796 The defendant, charged with criminal possession of a forged instrument in the third degree, in violation of Penal Law § 170.20, moved to suppress physical evidence and the use of a statement made to law enforcement. On May 11, 2004, Judicial Hearing Officer (JHO) Alfred Kleiman held a pretrial Mappl Dunaway hearing which focused on the stop of defendant’s vehicle and the seizure of an in-transit permit from the vehicle.[1] Following the hearing, JHO Kleiman rendered certain factual findings but reserved decision on the propriety of the stop, requesting that the parties submit memoranda of law on the issue. Pursuant to CPL 255.20 (4), this matter has been referred to this court to determine the defendant’s motion to suppress physical evidence based upon the motion papers, memoranda of law and the transcript of the testimony heard on May 11, 2004. For the purpose of this hearing only, the parties have stipulated that the testimony of the People’s witness, Police Officer Steven Lohr, was credible in all respects.
In his memorandum of law, defense counsel argues that the stop of defendant’s vehicle was unlawful because Officer Lohr did not observe the defendant commit a violation of the Vehicle and Traffic Law. Defense counsel asserts that, although Officer Lohr testified he observed the defendant operating a motor vehicle without front and rear license plates, registration or inspection stickers, these items are not required in that the officer also observed an in-transit permit affixed to the rear window of defendant’s vehicle.
The defendant further argues that Officer Lohr’s practice of stopping all vehicles bearing in-transit permits was an impermissible roving patrol since it was conducted in the absence of uniform nonarbitrary written guidelines for the purpose of uncovering general criminality. Lastly, the defendant contends that the “plain view” exception is inapplicable since Officer Lohr did not determine the validity of the in-transit permit until after defendant’s vehicle had been stopped.
In their response, the People maintain that the stop was productive, minimally intrusive and reasonable, in that it promoted a legitimate governmental interest — combating the high prevalence of forged in-transit permits. The People also argue that the stop entailed the mere viewing of the permit, displayed on the “rear windshield” in plain view, the authenticity of which was readily apparent. In support of their arguments, the People cite People v Carty (164 Misc 2d 275 [Sup Ct, *797 Queens County 1995]). However, the facts in Carty are significantly different from those here. There, officers were assigned, for a 30-day period, to conduct safety checks of taxicabs by distributing pamphlets and advising drivers that plainclothes officers were present in the area if they needed assistance. The court reviewed these stops by applying factors discussed in People v Scott (63 NY2d 518 [1984]) and People v Spencer (84 NY2d 749 [1995], cert denied 516 US 905 [1995]). These factors include the purpose of the stop, its productivity and intrusiveness. Based upon its analysis, the court determined (at 282), unlike the situation here, that the taxicab was not a target of police investigation and that “the facts indicate a restrained limited use of police authority . . . .’’In holding that the stop was permissible, the court concluded, “that the nontarget stop was part of a valid but limited safety program.” (People v Carty, 164 Misc 2d at 282.)
Facts:
In this case, Police Officer Lohr testified on behalf of the People and was the sole witness at the hearing. Officer Lohr, who is a seven-year veteran of the New York City Police Department, stated that, on January 13, 2004, he was assigned to the Grand Larceny Auto Unit (GLA unit) of the 113th Precinct in Queens County. On that date, the officer testified, he was in uniform and in a marked police vehicle. According to the officer, the GLA unit investigates anything to do with vehicles, including checking the authenticity of in-transit permits and any other temporary paper plates. These checks involve examining the items to determine if they are authentic or whether they are altered or photocopied. The officer explained that, “[b]ecause there’s an inordinate amount of forged, altered, in transits [sic] and registrations, especially in South Jamaica, Queens,” his practice is to stop all vehicles bearing in-transit permits.
At about 3:15 p.m., Officer Lohr testified he was proceeding westbound on Rockaway Boulevard when he observed a dark colored 1989 Maxima traveling in the opposite direction without a front license plate, registration or inspection sticker. As the Maxima passed him, the officer saw that it had no rear license plate, but noticed that it did have a New York in-transit permit affixed to the rear window on the driver’s side. The officer then radioed his sergeant, who was traveling eastbound on Rockaway Boulevard, to pull the vehicle over. The call consisted of “[g]ray Maxima, heading in your direction, on Rockaway Boulevard, going to 140.” The vehicle was about 50 to 100 feet ahead of the *798 sergeant’s car. The officer testified that a vehicle having a valid in-transit permit does not require license plates or a registration sticker. He further testified that the vehicle had committed no traffic violations at the time it was pulled over.
After communicating with his sergeant, Officer Lohr made a U-turn and joined the sergeant at the scene. The sergeant had exited his vehicle and was standing in front of his police car behind the Maxima. The officer saw the defendant, who was the driver of the Maxima, standing near the rear of that vehicle. Officer Lohr observed the in-transit permit and determined that it was not authentic. He stated that the permit had no perforated edges, appeared to be a photocopy of an original and that the vehicle information on the permit was not filled in by the dealer. Furthermore, he testified that the ink on an authentic in-transit permit does not run as it does on a photocopy. After making these observations, the defendant was arrested.
Legal Analysis:
The Supreme Court has held that a vehicle stopped as a result of a roving patrol is a seizure within the meaning of the Fourth Amendment. (See Delaware v Prouse, 440 US 648 [1979]; United States v Brignoni-Ponce, 422 US 873 [1975].) “[T]he reasonableness of such seizures depends on a balance between the public interest and the individual’s right to personal security free from arbitrary interference by law officers.” (United States v Brignoni-Ponce, 422 US at 878, citing Terry v Ohio, 392 US 1, 20-21 [1968].) “Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.” (Brown v Texas, 443 US 47, 50-51 [1979].) The Court of Appeals has applied this same test to review suspicion-less automobile stops including roving patrols. (People v Abad, 98 NY2d 12 [2002]; Matter of Muhammad F., 94 NY2d 136 [1999], cert denied 531 US 1044 [2000].) Moreover, the Court of Appeals has held that all such vehicle stops must be “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.” (People v Abad, 98 NY2d at 17; Matter of Muhammad F., 94 NY2d at 142.)
In Muhammad F., police officers assigned to a taxi-livery task force conducted roving patrols in unmarked police cars. The officers selected locations involving a high incidence of robberies against taxicabs and, in the absence of probable cause or any suspicious behavior, pulled over a predetermined percentage of *799 livery cabs for the purpose of conducting safety checks. The checks involved a brief conversation with the driver after which any passengers were requested to exit the vehicle. Officers then conducted searches around and under the seats. The stops generally occurred between the hours of 6:00 p.m. and 2:00 a.m.; however, the number of vehicles pulled over was left in the discretion of the officers.
The Court of Appeals concluded that the stops violated the Fourth Amendment and constituted unreasonable seizures. In conducting its analysis, the Court found no proof that the means employed was effective in combating crimes against livery drivers or that less intrusive or discretionary means were unavailable. The Court also found there was no fixed format or written guidelines for conducting the stops in question. It should be noted that the Court came to its determination despite the fact, absent here, that the officers were given verbal instructions as to how the stops were to be conducted.
In Abad, the defendant, who was a passenger in a livery cab, challenged the stop of that vehicle pursuant to the TRIP program. Vehicle owners who enrolled in the program were issued decals authorizing a brief stop and inspection of those vehicles as part of a program to combat robberies and murders of livery drivers. The Court of Appeals determined that (at 17), “TRIP . . . properly balances the competing interests under Brown.”
It is significant to note that in Abad, the Court reiterated its concern regarding the use of roving patrols as opposed to vehicle check points or other less intrusive procedures. “In Muhammad F., we were troubled by the lack of evidence of the effectiveness of conducting random, suspicionless patrol stops, as opposed to less intrusive methods, particularly given the ‘elevated potential intrusiveness and . . . greater opportunities for the unlimited exercise of discretion by police’ implicated by such stops.” (People v Abad, 98 NY2d at 17-18 [citation omitted].)
Applying these principles to the case at bar, this court finds that the purpose of the stop — to insure that only properly authorized vehicles are being operated on the public streets and highways — is a valid public concern worthy of the attention of law enforcement. However, the evidence adduced at the hearing fails to justify the use of a roving patrol, much less the practice employed in connection with this seizure. There was no testimony that the stop of defendant’s vehicle was the result of *800 a departmental initiative or at the direction of the precinct command. Rather, the officer, apparently on his own initiative, employed the practice of stopping any vehicle he observed with an in-transit permit.[2] In support of this practice, as noted above, Officer Lohr testified as to the “inordinate amount” of forged and altered in-transit permits in South Jamaica, Queens. However, no evidence was offered to support the officer’s statement concerning the prevalence of forged, photocopied or altered vehicle documents in the area of South Jamaica. The hearing record contains no reference to any statistics compiled by the Police Department, the officer’s unit or even any approximations by the officer himself regarding the number of arrests for this offense. Moreover, Officer Lohr did not testify as to whether other less intrusive investigative methods had been tried and whether he or a supervisor had found that roving patrols were the most effective means to prevent these crimes. (See Matter of Muhammad F., 94 NY2d at 147.) Additionally, Officer Lohr did not testify that the scene of this incident, Rockaway Boulevard and 140th Street, is considered South Jamaica or that his assignment at the 113th Precinct covers this area.
Furthermore, the hearing record contains limited testimony concerning the circumstances surrounding the defendant’s stop by the sergeant. Officer Lohr testified that once at the scene he observed both the sergeant and the defendant standing near their vehicles. The officer estimated that he arrived at the location of the stop approximately five to ten minutes after the radio transmission to his sergeant. Because he was not present at the time the defendant exited his vehicle, Officer Lohr was unable to provide critical details about the circumstances of the initial contact between the defendant and law enforcement.
Finally, no testimony was offered to establish that the officer’s practice was “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.” (People v Abad, 98 NY2d at 17.) Just as in People v Mirin (280 AD2d 495 [2d Dept 2001]), where two officers decided to conduct taxicab safety checks, stopping every third occupied taxicab, the officers here lacked specific direction from a com *801 manding officer or other supervisory authority. In Mirin, the defendant was a passenger in one of the taxicabs stopped by the officers. After observing the defendant and a second passenger engaging in suspicious activity, the two were removed from the cab. A handgun was subsequently recovered on the floor of the cab near where the defendant had been seated. Relying on Muhammad F., the Second Department held that “[although the governmental interest of protecting taxi cab drivers is important, any benefit is outweighed by the lack of evidence regarding the effectiveness of this procedure as opposed to other, less discretionary, procedures, and by the intrusive nature of the stop.” (People v Mirin, 280 AD2d at 496-497.)
In conclusion, although the People have demonstrated that the stop of defendant’s vehicle was designed to address an important public concern, no facts, aside from the officer’s limited testimony, were presented justifying the need for this type of seizure, nor was any proof submitted demonstrating the effectiveness of this procedure versus other less discretionary and less intrusive options. Lastly, no evidence was presented showing that the stop here was conducted pursuant to a plan containing specific guidelines as to the conduct of individual officers. Accordingly, this court finds that the stop of defendant’s vehicle was improper and grants the defendant’s motion to suppress physical evidence.

. Prior to the hearing, the People withdrew their statement notice.

. It should be noted that, although Officer Lohr testified that pursuant to his assignment that day he had received a directive to check on the authenticity of New York State temporary license tags, there was no testimony that he had been instructed to pull over all vehicles with such tags, in the absence of other reasons to do so. Rather, on direct examination, he simply stated that his assignment to the GLA unit that day involved “investigat[ing] anything that has to do with vehicles.”